**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                              No. 1:11-CR-01235-MCA-1

**BILLIE TIEA VAUGHN**,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendant Billie Tiea Vaughn's *Amended Motion to Suppress*, filed October 6, 2011.  [Doc. 45]  On October 21, 2011, the Court held an evidentiary hearing on Defendant's motion in Albuquerque, New Mexico. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and being fully advised in the premises, the Court grants Defendant's motion based upon the following Findings of Fact and Conclusions of Law.

**I.**     **FINDINGS OF FACT**

1.     On April 18, 2011, DEA special agent Jarell Perry (Perry) and Albuquerque Police Task Force Officer Jeannette Tate (Tate) boarded an Amtrak train in Albuquerque which was traveling eastbound from Los Angeles to Chicago.  [Doc. 45 p.2-3; Doc. 41 at 1]

1

2.      The officers boarded the train as part of their routine drug interdiction duties. [Tr. 9:19:02-9:20:16]

3.      Both Perry and Tate were dressed in plain clothes.  [Tr. 9:36:34; Tr. P. 150]

4.      As he normally does, Perry first went to the crew car and reviewed the passenger ticket stubs. [Tr. 9:20:20-9:29:10]

5.      Upon reviewing the ticket stubs, he learned that Defendant and her cousin, Keshawn Henderson (Henderson), had boarded the train in Fullerton, California and had purchased two one way tickets from Fullerton to Chicago with cash on the date the Amtrak train departed from Fullerton.  [Doc. 45 p. 3; Doc. 41 p.1; Tr. 9:20:20-9:29:10]

6.      The fact that Defendant and Henderson had paid for the tickets with cash, that the tickets were one way, and that the tickets were purchased on the date of departure caused Perry to believe that Defendant and Henderson might be transporting illegal narcotics.  [Tr. 9:26:52]

7.      Perry determined that he would locate and speak to Defendant and Henderson [Tr. 9:26:52-9:28:28] and proceeded, with Tate, to the train car Defendant and Henderson were assigned to. [Tr. P. 20-21]

8.      Perry entered at the rear of that train car and Tate at the front. [Tr. 9:31:26]

**The Environment of the Amtrak Train Car**

9.      The train car was full of passengers. [Tr. 13:51:52] Indeed, there were numerous passengers in and about the car and aisle way proximate to Defendant.  The Court

2

has reviewed the audio recording, critical portions of which are inaudible due to multiple overlapping conversations (most of which are unintelligible), considerable background noise, as well as various announcements being made by train personnel on the loudspeaker system. [Ex. 1; See also Tr. 10:49:52]

10.     The train car was a noisy and bustling and hectic environment typical of railway transit. [Id.]

11.     The aisle way was narrow and Defendant was situated in the third seat from the rear of the train car. [Tr: 09:34:08; 09:44:40]

**Encounter with Defendant**

12.     Neither Perry nor Tate had knowledge of Defendant or Henderson's appearance, race, or gender.  [Tr. 9:29:24]

13.     Perry encountered Defendant and Henderson at the rear of the train car.  Defendant was seated on the right hand side of the train (when viewed from the direction the train was traveling) and was sitting directly behind Henderson. [Tr. 13:51:26]

14.     When he first interacted with Defendant and Henderson, Perry was alone and Tate was not in view.  [Doc. 45 at 3-4]

15.     Perry showed the women his badge [Doc. 45 p. 3; Doc. 41 p. 1-2] and in a normal conversational tone of voice, asked whether he could speak with them. [Doc. 45 p. 3; Doc. 41 p. 2]

16.     Both women responded affirmatively.  [Ex. 1 at 0:37-1:11]

17.     Perry asked to see Defendant's and Henderson's train tickets.  [Tr. P. 35-36]

18.    The women provided Perry with their tickets and, although Perry didn't ask for

them, their identification cards as well.  [Id.]

19.    Perry reviewed the tickets and identification cards and then promptly returned

them. [Tr. 9:57:52]

20.    Thereafter, Perry questioned the women about their destination, where they had

come from, and how long they had been traveling.  [Ex. 1]

21.    Perry's line of questioning was not entirely clear and confused the women at times.

[Id.]

22.    Through questioning, Perry discovered that the women had boarded the train in

California, that they had flown to California a week before their departure, that

they lived in Connecticut, and that they had three pieces of checked luggage.  [Id.]

23.    Perry informed Defendant and Henderson that he was investigating security

concerns, specifically whether any passengers might be carrying weapons or

explosive devices. [Doc. 45 at 4; Doc. 41 at 11]

24.    When Perry explained this to the women, either Defendant or Henderson

responded "well, that's good actually, that you all are doing this since nine

eleven."  [Ex. 1]

25.    Perry did not inform the women that he was interested in discovering whether they

might be transporting illegal narcotics.  [Doc. 45 at 4; Doc. 41 at 11]

26.    Perry inquired whether he could search the unchecked bags Defendant and

Henderson had with them at their seats.  [Doc. 45 at 3; Doc. 41 at 2]  The women

agreed.  [Doc. 45 at 4]

27.　Perry searched several bags but discovered no evidence of illegality.  [Doc. 45 at 4; Doc. 41 at 2]

28.　While searching the bags, Perry asked additional questions about Defendant's and Henderson's trip to California, about the women's employment in Connecticut, and about the women's home life. [Ex. 1]

29.　Perry then asked Defendant and Henderson if they would consent to a search of the blankets they had with them.  [Exhibit 1 at 8:07]  The women agreed but that search also revealed no evidence of illegality.

30.　Perry then questioned Defendant and Henderson about their checked luggage and inquired whether they would consent to a search of those bags provided that he could find them.  [Doc. 45 at 4; Doc. 41 at 7,11]  Again, the women consented.  [Doc. 45 at 4]

31.　Before departing, Perry requested the women's consent to search their purses.  [Ex. 1; Tr. 11:04:20–11:04:36]  Defendant and Henderson once more consented, but at this point either Defendant or Henderson asked whether Perry intended to similarly search any other passengers.  [Id.]

32.　Perry responded that he intended to search as many other passengers as he could.  [Id.]

33.　Perry's search of the purses again revealed no evidence of contraband.

34.　Perry then departed Defendant and Henderson and walked towards the front of the

train car and out of their view.  [Tr. 13:58:40]

35.  After leaving Defendant and Henderson, Perry met with Tate.  [Tr. p.118-19]

36.  Perry explained to Tate that he had made contact with Defendant and Henderson, that he had searched their unchecked bags and that he had found nothing.  Perry further explained to Tate that he wanted to ask Defendant and Henderson for permission to conduct a pat down search of their persons and that he wanted Tate to be present to perform the searches. [Tr. P.43]

37.  Tate agreed to assist Perry and the officers proceeded back towards where the women were seated.  [Tr p. 43-44]

38.  Less than three minutes elapsed between the time Perry left Defendant and Henderson and the time he returned with Tate.  [Tr. 14:00:36]

39.  Defendant and Henderson were still seated in the same position; Defendant was sitting directly behind Henderson.

40.  Based on the Court's review of the audio recording of Perry's interactions with Defendant and Henderson, the Court finds that Perry's tone of voice shifted during his second encounter with the women; his tone was more serious, terse, and business-like on this occasion and less conversational.  [Ex. 1]

41.  Perry first addressed Henderson and asked if he could speak with her for a moment.  Though her response is somewhat inaudible, the Court's review of the recording indicates that Henderson did again agree to talk with Perry. [Ex. 1]

42.  Perry then stated the following to Henderson: "sometimes we find that people have

6

stuff on their person.  You don't have any weapons or anything on your person do you?"  [Ex 1]

43. Henderson did not understand what Perry meant by the word person and asked "on my who?" [Id.]

44. Perry restated his question but Henderson again did not understand the meaning of the word "person." [Id.]

45. Perry finally clarified that he meant on her "body" and began to ask Henderson whether she would consent to allow Tate to perform a pat down search of her body. [Id.]

46. The Court's review of the audio recording of the interaction reveals that, before Perry finished asking Henderson whether she would consent to a pat down search, Tate interjected and informed Henderson that they were "gonna pat you down."

47. Tate testified that she waited until Perry asked for and received Henderson's consent before engaging Henderson, [Tr. 106-08] but the Court finds that this testimony is inconsistent with the recording.  The Court finds that Tate informed Henderson that she would be patted down before Perry finished asking Henderson whether she would consent to a pat down.

48. Henderson rose to her feet and was patted down by Tate.  [Tr. 45]

49. Defendant was talking on her cell phone while Perry and Tate were interacting with Henderson. [Tr. 14:01:50]  However, Defendant overheard Perry's and Tate's communications with Henderson and specifically heard Tate instruct Henderson

that they were going to pat her down. [Tr. 14:01:50]

50. Immediately after Perry finished speaking with Henderson, Perry addressed Defendant who was still on her cell phone and similarly asked whether she had "any weapons on her person?"  Immediately after and before Defendant could respond, Perry also asked whether Defendant would consent to allow Tate to perform a pat down search of her person.  [Ex. 1]

51. Defendant testified that she did not recall Perry asking whether she would consent to a pat down search.  [Tr. 14:04:02]  The Court finds Defendant's testimony to be credible with respect to her inability to recall, but concludes based on the audio recording, that Perry appeared to ask Defendant whether she would consent to allow Tate to perform a pat down search.

52. Defendant was on her cell phone when Perry asked for her permission to perform the pat down search.  Specifically, the Court credits Defendant's testimony when she testified that she was the unidentified female in the recording and transcript [Exhibits 1, 2a and 4] who was on her cell phone saying "Can I call you back?" after Perry asked for her consent for the pat down search.

53. The Court finds that Defendant did not hear or comprehend Perry's request for Defendant's permission to perform a pat down search, because she was distracted by her cell phone conversation and the multiple overlapping conversations in the train car occurring around her.

54. Tate testified that Defendant was not on her cell phone when Perry asked for her

consent for the pat down search.  [Tr. P. 125]  Tate's testimony is inconsistent with Defendant's and Perry's recollections.  Both Defendant and Perry testified that Defendant was on her cell phone when Perry asked for her consent for the pat down search.  [Tr. 46-47; 155-56] The Court specifically does not credit Tate's testimony on this point.  The Court finds that Defendant was on her cell phone when Perry asked for her consent.  The Court credits Perry's testimony that he observed Defendant speaking on a cell phone.

55.    Tate testified that she also received a cell phone call at the time Perry was asking Defendant for her consent and further testified that she informed the caller that she would have to call them back.  [Tr. 135-36] The Court does not credit Tate's testimony.

56.    In response to Perry's inquiry, which Defendant did not hear or comprehend, Defendant said "yes," but without any break in her speech, inquired why she and Henderson were being singled out and why Henderson had been pat down.  [Ex. 1]

57.    The Court finds that a reasonable officer in Perry's position would not have understood Defendant's response as clear and unequivocal consent to the pat down search in light of Defendant's obvious distraction (due to her cell phone conversation and the multiple overlapping conversations occurring around her), the tone of her response, and the nature of her response, which questioned Perry's persistent questioning and the need for further searches.

58.    Perry responded that he and Tate were "going to go to other cars and talk to other

people, too."  [Ex. 1; Ex. 2a]

59.  After Defendant ended her cell phone call, she asked Perry whether she should

stand. [Ex. 1] Various conversations continued to overlap at this point.

60.  At the very same moment Defendant asked Perry whether she should stand,

Henderson asked Perry whether he had located their luggage. [Ex. 1]

61.  Perry responded to Henderson's question about the luggage and Tate responded to

Defendant by directing her to "step back here," into the aisle way.  [Ex. 1]

62.  Tate began patting down Defendant while Perry spoke with Henderson.  [Ex. 1; Tr.

P. 157]

63.  During Tate's pat down of Defendant, Tate identified a bulge in the waist band

area of Defendant's pants.  [Tr. P.111]

64.  Tate asked Defendant what the bulge was, but Defendant was unresponsive. [Id.]

65.  Based on her experience, Tate believed the bulge was some form of contraband.

[Id.]

66.  Tate removed the item from Defendant's waist band; it was a small white bundle

wrapped in plastic.  [Tr. 49-50]

67.  Tate showed the bundle to Perry who recognized it as some form of illegal

narcotics. [Id.]

68.  Perry handcuffed Defendant and took her into custody. [Id.]

69.  Perry and Tate transported both Defendant and Henderson to the DEA office and

placed them in holding cells.  [Tr. p. 58-59]

70.   Perry tested the substance seized from Defendant and those tests returned positive
      for cocaine.  [Tr. P.59]

71.   Once Perry learned the results of his tests on the substance, he processed
      Defendant and Henderson.  This involved *Mirandizing* the women and obtaining
      statements from them.  [Tr. 59]

72.   After being *Mirandized*, Defendant spoke with Perry and stated that she found the
      seized narcotics in a bathroom at the Amtrak station in California and kept it with
      the intention of selling a portion of it for profit.  [Tr. P. 59-60]

**Attempts to Revise the Official Transcript and Supplement the Content and
Substance of the Audio Tape.**

73.   On October 21, 2011, the Court conducted an evidentiary hearing on Defendant's
      *Amended Motion to Suppress*. [Doc. 45]

74.   At the hearing, the Government introduced into evidence an audio recording of the
      Defendant's April 18, 2011 encounter with Perry and Tate on the Amtrak train.
      [Ex. 1] The Government also introduced into evidence, for demonstrative purposes
      only, a transcript of that encounter prepared by an official court reporter
      (hereinafter referred to as "the official transcript"). [Ex. 2a; Tr. 12:21:52]

75.   Approximately a month and a half before the hearing, the Government attorney
      gave Perry a three-page excerpt from the official transcript and encouraged him to
      make substantive changes to it. [Tr. 10:09:24-10:10:14; 10:12:18: 10:15:10;
      10:48:06; 11:19:02]

76. Perry testified that he listened to the audio recording thirty (30) or forty (40) times and that in his opinion a large portion of the official transcript is inaccurate. [Tr. 10:49:06; 10:59:28]

77. Perry listened to the recording so many times because "the recording wasn't clear and there were–there was a car attendant making overhead announcements, there was other passengers speaking that was [picked] up on the recording and [he] had to try and pick out when Miss Henderson was speaking, when Miss Vaughn was speaking, when [he] was speaking, when other passengers were speaking and specifically what each individual person was saying." [Tr. 10:49:52]

78. Although Perry listened to the audio recording thirty (30) or forty (40) times and made substantive changes to the transcript based upon these repeated efforts, he admitted that he "can't remember every detail of everything that was said on that encounter." [Tr. 11:11:24]

79. Prior to the hearing, Perry handwrote substantive changes to the transcript on the excerpt of the official transcript provided by the Government attorney.  These handwritten changes included identifying the speakers in the transcript, inserting phrases for inaudible portions of the audio recording, and clarifying perceived errors in the transcription.  These handwritten changes were admitted into evidence for demonstrative purposes only as Exhibit 4. [Ex. 4; Tr. 12:21:52]

80. The Government attorney also gave Tate a three-page excerpt from the official transcript and encouraged her to make substantive changes. [Tr. 10:14:40-

10:15:10] Although Tate reviewed the transcript, she did not make any substantive changes aside from attempting to identify the unidentified speakers. [Tr. 11:59:46-12:01:46]

81.     The Government attorney compiled the changes made by both Perry and Tate, and crafted yet another "transcript" which was identified and proffered as Exhibit 2. [Tr. 10:13:48-10:14:40; 10:15:10; 10:17:40] Perry based his in-court testimony on Exhibit 2, which the Court observed to be in his possession at the witness stand. Perry stated that he had not seen the document (Exhibit 2) prior to the hearing and that he was given the document at the hearing and that he had not compared the document (Exhibit 2) with his handwritten changes (Exhibit 4).  Exhibit 2 incorporated Tate's changes, of which Perry was unaware. [Tr. 11:22:28-11:25:02]

82.     Defendant objected to Exhibit 2, arguing that the Government was "trying to make an illegal search legal by making changes to the transcript." [Tr. 12:24:04]  The Government agreed to withdraw Exhibit 2. [Tr. 12:24:50–12:25:08]

83.     Based on the foregoing, the Court finds that the Government attempted to  unfairly alter the content of the official transcript and thus the substance of what is purported to be represented on the audio recording in this case.  Specifically, the Court finds that the Government attempted to take advantage of the obviously poor quality of the audio recording and the chaotic environment in the train car by having its witnesses, Perry and Tate, make substantive changes to the official transcription of the recording in a manner that favored the Government's case.

13

84.     Even though the tender of Exhibit 2 was ultimately withdrawn by the Government,
        I find that the information it contained - information which was added long after
        the encounter - formed the basis of Perry's and Tate's in-court testimony. Because
        Perry and Tate's testimony as to what was said during the encounter was based on
        the text that was added to withdrawn Exhibit 2, as opposed to their independent
        recollection of what was *said during the encounter*, I conclude that such testimony
        was unreliable.  In so finding, I point to Perry's own description of the chaotic
        train car environment and his acknowledgment that the recording was not clear and
        the identity of the speakers could not be ascertained, nor could much of the content
        of the speech, all as noted in Finding 77, above.

85.     The Court does not credit Perry's or Tate's testimony regarding the identity of the
        speakers or the content of their statements, to the extent that this testimony
        conflicts with the audio recording and the transcript prepared by the official court
        reporter. [Exs. 1 and 2a] In this regard, the Court finds that the testimony of both
        Tate and Perry as to what they *heard* in the train car - such testimony given some
        six months after the actual encounter - was colored or influenced  by the
        Government's efforts, prior to the suppression hearing, to encourage substantive
        revisions to the official transcript under circumstances where there existed
        legitimate ambiguity as to what was represented on the audio tape.

86.     In arriving at its findings of fact in this case, the Court relies on its own
        independent review of the audio recording, as aided by the official transcript, and

the testimony of Defendant, who the Court finds to be a credible witness based on the Court's in-court observation of her demeanor and body language.

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant's primary arguments in support of suppression are twofold: (1) that, at the time of the pat down search, the encounter had escalated from a consensual encounter into a seizure and the seizure was not supported by reasonable articulable suspicion; and (2) that the officers violated her Fourth Amendment rights because she did not give consent to the pat down.  [Doc. 45 at 8, 18]  In addition, Defendant claims that the incriminating statements she made to Perry after her arrest must also be suppressed because the taint of the unlawful seizure and/or search had not dissipated.  [Doc. 45 at 12, 26]  The Court addresses these arguments in turn.

### A.   Whether the Encounter Escalated Into a Seizure

Defendant concedes that her initial interaction with Perry was consensual.  [Doc. 45 at 25]  Defendant argues, however, that this consensual encounter evolved into a seizure when she was subjected to a pat down search to which she did not consent.  [Doc. 45 at 25]

There is no question that a non-consensual "pat-down search could transform a consensual encounter into a Fourth Amendment 'seizure.'"  *United States v. Chavez*, 429 Fed.Appx. 807, 812 (10th Cir. 2011) (*citing United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir.2009) ("listing, among the factors to be considered in determining whether an encounter constitutes a seizure, physical touching by an officer . . . .")

15

(internal quotation marks and citation omitted)).  However, "[a]n officer's request for consent to search . . . does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required."  *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993).  This is because "a search conducted pursuant to a valid consent is constitutionally permissible . . . and wholly valid."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  Whether Defendant consented to the pat down search resolves both of Defendant's primary arguments.  *See United States v. Drayton*, 536 U.S. 194, 206 (2002) ("In circumstances such as these, where questions of voluntariness pervade both the search and seizure inquiries, the respective analyses turn on very similar facts.").  Accordingly, the Court proceeds to consider whether the pat down search was consensual.

**B.    Whether Defendant Consented to the Pat Down**

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Id.* at 219 (internal quotation marks and citations omitted).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Id.*

"If the government seeks to validate a search based on consent, the government bears the burden of proving that the consent was freely and voluntarily given."  *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996).  The Court should not presume the

16

consent was either voluntary or involuntary.  *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).  Our Tenth Circuit has established a "two-step test for determining the voluntariness of a consent: [f]irst, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. [Second], the government must prove that this consent was given without implied or express duress or coercion."  *McRae*, 81 F.3d at 1537 (internal quotation marks and citation omitted).

The Court may consider the following relevant considerations when examining whether, under the totality of the circumstances, Defendant's consent was unequivocal and specific and freely and intelligently given and was given without implied or express duress or coercion:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons.  Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).  Defendant's "subjective state of mind" regarding police officers "may be relevant to some degree to the issue of the voluntariness of [her] consent," *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir.1993), but must be considered in light of all the other relevant circumstances.  *United States v. Hill*, 199 F.3d 1143, 1150 (10th Cir. 1999).  Finally,

whether the Government misrepresented the reason for the request for the search may also factor into the Court's assessment. *Harrison*, 639 F.3d at 1278-79.

Applying these standards, the Court begins by examining whether Defendant's consent was unequivocal and specific and freely and intelligently given. [Doc. 45 at 9-10] Defendant was distracted when Perry asked for her consent for the pat down search because there were multiple overlapping conversations occurring at once and Defendant was on her cell phone. *See United States v. Gerby*, 41 Fed.Appx. 312, 315 (10th Cir. 2002) (unpublished) (acknowledging the defendant's argument that he did not consent to a search because he was distracted but declining to review the merits of that argument as it was not preserved). In light of Defendant's obvious distraction, the Court concludes that she did not fully hear or comprehend Perry's request for permission to perform a pat down search. It is well established that consent is ineffective if the defendant does not comprehend an officer's request to search. *See United States v. Benitez-Arreguin*, 973 F.2d 823, 825, 829 (10th Cir. 1992) (affirming the district court's holding that the defendant did not unequivocally consent to a search when "there was an obvious language barrier and it was obvious to the officer that the defendant did not speak English").

The Court recognizes that Defendant said the word "yes" in response to Perry's request to search, but the Court cannot ignore the factual context of in which this response was given, the remainder of Defendant's response, or the tone in which it was conveyed. Defendant's exact response to Perry's request for consent to the pat down search was

18

"Yes.  But why are doing like [inaudible] pat her down." [Ex. 2a]  Under these

circumstances, the Court finds that Defendant's "yes" should be interpreted as an

acknowledgment that Perry had spoken to her, rather than affirmative consent to submit

to a request to search (which Defendant did not hear or comprehend).  This finding is

consistent with Defendant's in-court testimony that she did not recall Perry asking for her

consent to search and that she did not recall giving her consent to the search, which the

Court finds to be credible. [Tr. 14:04:00-14:04:20]  Moreover, although some words in

the remainder of Defendant's response are unclear, her tone and the import of her

response are quite clear: Defendant objected to Perry's persistent questioning and wanted

an explanation as to why Henderson had been subjected to a pat down search.  Under

these circumstances, a reasonable officer in Perry's position would not have construed

Defendant's response as clear and unequivocal consent and would have, at the very least,

sought further clarification before proceeding with a pat down search.  *See Zapata*, 997

F.2d at 758 (noting role of objective factors in determining voluntariness of consent).  In

light of these facts, the Court holds, based on the totality of the circumstances, that

Defendant did not unequivocally, voluntarily, specifically, freely, and intelligently

consent to the pat down search.

Defendant's statement "do you want me to get up" and her action of rising to her

feet do not, in this Court's view, indicate that Defendant unequivocally and freely and

intelligently consented to the search.  Defendant's question and her movement are equally

indicative that she understood she had no choice but to get up, because she had just

19

witnessed the pat down search of Henderson.  This construction of the encounter is supported by Tate's response as well as Defendant's in-court testimony.  The audio recording reflects that Tate authoritatively instructed Defendant to "step back here" in the aisle way for a pat down search immediately following Defendant's question and movement.  Additionally, Defendant testified that she did not give consent to search. When asked whether she was given time to think about it (the search), she stated: "No. 'cause even when I was, you know, like asking 'em why and sorta like contesting it she was just giving directive about step over the seat and come into the aisle." [Tr: 14:04:20] "[A] mere submission in orderly way to actions of arresting agents, is not that consent which constitutes unequivocal, free and intelligent waiver of [a] fundamental right." *United States v. Gregory*, 204 F.Supp. 884, 885 (D.C. N.Y. 1962) (*citing Johnson v. United States*, 333 U.S. 10, 13 (1948)).

For the foregoing reasons, the Court concludes that Defendant did not unequivocally, specifically, freely and intelligently give consent to the pat down.  Further, even if Defendant had consented to the pat down search, the Court nonetheless concludes that Defendant's consent was invalid because it was obtained through implied or express duress or coercion, as discussed below.

Perry's request to search Defendant's person cannot be viewed in a vacuum; the Court must consider the totality of the circumstances, including Perry's prior interaction with Defendant.  In his prior interaction with Defendant, Perry had requested and received consent to search Defendant's unchecked bags, blankets, purse, and checked

20

luggage.  By the time that Perry asked to search Defendant's purse, either Defendant or

Henderson questioned the propriety of Perry's actions.  It is well established that

"[a]ccusatory, persistent, and intrusive questioning can turn an otherwise voluntary

encounter into a coercive one."  *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir.

2003).  The Court concludes, based in part on the reasons explained below, that by the

time Perry asked to search Defendant's person, after multiple objections by Defendant

and/or Henderson, Perry's questioning had become persistent, intrusive, and coercive.

During his initial interaction with Defendant, Perry's tone was friendly, congenial,

and conversational.  When Perry ended the first encounter, ostensibly to search

Defendant's and Henderson's checked luggage, Defendant believed that the encounter

with Perry had come to an end. [Tr. 14:00:24] However, less than three minutes later,

Perry returned with a second officer, Tate.  During the second encounter, Perry's

demeanor changed.  He was no longer friendly, congenial, and conversational.  Instead,

he spoke to Defendant and Henderson in a quick, terse, and business-like manner.

Without any preamble, he immediately asked to search Henderson's person.  After

clarifying what he meant by the word "person," Perry asked for a second time whether

Henderson would consent to a search of her person.  Before Perry could even finish his

request or Henderson could reasonably formulate a response, Tate interjected that she was

"gonna pat [Henderson] down" and proceeded to subject Henderson to a pat down search.

The Court takes this opportunity to observe that Perry previously had dealt with

Defendant and Henderson collectively throughout his interactions with the women.  He

asked them the same questions and subjected the women to the same searches.  When

Defendant witnessed the pat down search of Henderson, a search to which Henderson did

not have the opportunity to object or consent, Defendant could reasonably conclude that

she too had no choice but to submit to a pat down search.  In this regard, I conclude that

Defendant was coerced.  *See United States v. Rodriguez*, 525 F.2d 1313, 1316 (10th Cir.

1975) (complying with an order to submit to a search does not constitute consent because

"[w]hen consent is relied on to justify the lawfulness of a search, the Government has the

burden of showing that consent was, in fact, freely and voluntarily given, and this burden

is not met by merely showing acquiescence to a claim of lawful authority.").  Other

factors also weigh in favor of the conclusion that Defendant was coerced into submitting

to the pat down search.

Although our Tenth Circuit has held that an officer's failure to inform a defendant

that she is free to refuse consent is not per se evidence of coercion, *United  State v.

Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000), the Court has held that such

notification is nevertheless a relevant fact to consider.  *Id.*  Perry failed to inform

Defendant that she could refuse to submit to the pat down search, even after Defendant

specifically questioned why Henderson had been singled out for such treatment.  Under

these unique circumstances, the failure to inform Defendant of her right to refuse consent

weighs in favor of the conclusion that Defendant's consent was obtained through

coercion.

The Court's conclusion is further bolstered by the fact that Perry failed to inform

22

Defendant or Henderson that he was searching for illegal narcotics.  In *Harrison*, the Tenth Circuit explained that "when government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress."  639 F.3d at 1278-79. When Perry informed the women that he was searching for weapons and/or explosives, either Defendant or Henderson indicated that she felt reassured that law enforcement was being vigilant to protect their safety.  This comment indicates that Defendant and Henderson were less inclined to refuse Perry's questioning and his varying requests to perform searches in light of his stated purpose.  Perry's misrepresentation weighs in favor of the conclusion that Defendant's consent for the pat down was obtained through coercion.

The Government correctly observes that Defendant does not argue that she was subjected to physical mistreatment, violence, threats, threats of violence, promises or inducements of any kind.  Moreover, the Court agrees with the Government that several of Defendant's coercion arguments, as expressed in the pre-hearing pleadings, do not withstand scrutiny.  A person is more likely, not less, to refuse an officer's request when in a public setting such as a train car, *Zapata*, 997 F.2d at 757.  Tate and Perry's position in the train relative to Defendant—standing over her and blocking her egress—was not the product of the officer's conduct; it was simply the result of the fact that the interaction occurred on a train car.  *See Florida v. Bostick*, 501 U.S. 429, 436 (1991); *Broomfield*,

201 F.3d at 1275. Finally, the presence of two officers does not necessarily prove coercive tactics. *Zapata*, 997 F.2d at 758-59 (declining to give much weight to defendant's argument that the presence of two police officers elevated the encounter into a seizure).

Nevertheless, because Perry engaged in intrusive and pervasive questioning, because Perry's tone and demeanor was markedly different during the second interaction, because Defendant could reasonably conclude—based on her observation of Perry and Tate's interactions with Henderson—that she had no choice but to submit to the pat down, because Perry did not clarify that Defendant did not have to consent to the pat down, and because Perry misrepresented the reason why he wanted to search Defendant, the Court concludes that Defendant's consent was obtained through coercion. Accordingly, the Court concludes that the pat down search of Defendant's person was invalid and illegal. The evidence procured as a result of that search shall be suppressed.

## C.    Defendant's Post Arrest Statements

Finally, the Court considers Defendant's argument that incriminating statements she made to Perry following her arrest and after she was *Mirandized* should also be suppressed. In *Brown v. Illinois*, 422 U.S. 590, 591 (1975), the United States Supreme Court considered the admissibility of post-arrest incriminating statements made by a defendant who was arrested in violation of the Fourth Amendment but who received *Miranda* warnings prior to making those incriminating statements. The Supreme Court expressed the issue as "whether the statements were to be excluded as the fruit of the

24

illegal arrest, or were admissible because the giving of the *Miranda* warnings sufficiently attenuated the taint of the arrest." *Id.* at 591-92.  In resolving the issue, the Supreme Court identified several factors courts must look at to determine whether the taint of the initial Fourth Amendment violation was purged including: whether the Miranda warnings were given; the temporal proximity of the arrest and the confession; the presence of intervening circumstances; and, particularly, the purpose and flagrancy of the official misconduct. *Id.* at 603-04.  Applying these factors to the present matter, the Court concludes, as explained below, that the taint of the invalid search of Defendant had not been purged at the time Perry elicited the incriminating statements from Defendant post-arrest.

There is no question Defendant was *Mirandized*.  However, Defendant was questioned about the bundle found on her person during processing, which occurred not long after Defendant arrived at the DEA office.  The temporal proximity between the illegal search of Defendant and the questioning was short.  In addition, there were no significant intervening circumstances between the illegal search, Defendant's arrest, and her post-*Miranda* statements to Perry.  *See id.* at 604 ("Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever."); *see also United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) ("Some examples of intervening circumstances include 'carefully explain[ing]' a consent form and advising an individual of the right to withhold consent . . . release from custody, an appearance before a magistrate, or consultation with an

25

attorney.") (citations omitted).  Finally, as noted previously, several factors weigh in favor of the conclusion that Defendant's consent was not unequivocal and freely and intelligently given and was obtained through coercion.  Thus, the official misconduct here was significant.  On balance, the Court concludes that the taint of the illegal search was not purged at the time Defendant spoke to Perry and made incriminating statements.  Defendant's post-arrest post-*Miranda* statements must also be suppressed.

## III.    CONCLUSION

For the foregoing reasons, Defendant's amended motion to suppress is **GRANTED**.

**IT IS THEREFORE, HEREBY ORDERED** that Defendant's *Amended Motion to* Suppress [Doc. 45] is **GRANTED**.

**SO ORDERED** this 29th day of November, 2012, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
Chief United States District Judge